Filed 1/29/26  P. v. Monterrubio CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERIK LIMETA MONTERRUBIO,<br><br>    Defendant and Appellant. | A172249<br><br>(Marin County<br> Super. Ct. No. SC217512A) |

Erik Limeta Monterrubio appeals from convictions of sexual offenses against his 11-year-old goddaughter.  He contends the trial court abused its discretion in allowing the detective who first interviewed the child to testify that she was credible and that she behaved like a victim of sexual abuse.  We conclude his claims were forfeited by failure to object at trial on the grounds now raised and, in any event, any error was harmless.  His alternative claim of ineffective assistance of counsel is also without merit.

**BACKGROUND**

**I.**

***Factual Background***

**A. Prosecution Case**

Jane Doe was 14 years old at the time of trial.  Monterrubio was her godfather and she had known him all her life.  Doe's mother, Ruth, met Monterrubio's wife, Norma, about 16 years before trial and the two families

1

became very close.[1]  Ruth testified that they "did everything together," including holidays and traveling, and she considered them family.  Monterrubio and his wife had two sons:  A.L., who was a grade ahead of Doe, and H.M., who was about a year younger than Doe and had autism.

In May and June 2021, when Doe was 11 years old, Norma took care of her after school until Ruth picked her up around 5:00 or 5:30 p.m.  Norma would walk to the school with H.M. to pick up Doe and sometimes another child she was babysitting.  Doe testified that they would get to Norma's apartment about 3:00 p.m.  The apartment consisted of a kitchen connected to the living room; a bedroom shared by Monterrubio's family; and a bathroom accessed through the bedroom.  There was also a second bedroom with a bathroom across the hall that was used by roommates who split the rent with the family.

Doe testified that when they got to the apartment after school, A.L. would be in the living room, doing his online classes.  Everyone would stay in the living room, and the kids would do homework and sometimes watch movies.  She did not remember A.L. moving into the bedroom once they arrived.  H.M. was usually with Norma but sometimes he was in the living room alone.

Monterrubio would come home a little after Doe arrived, then leave half an hour later for a second job.  Sometimes Norma would go out to a nearby store while he was at home.  On one of these occasions, Monterrubio told Doe to come into the bedroom with him.  He closed the door and told her to lie down on the bed.  She lay down and he lay down next to her, then put

---

[1]  We use first names in the interest of readability.  No disrespect is intended.

2

his hand under her clothing, put his fingers inside her vagina and "went back and forth." She felt scared. It lasted five minutes, then he told her not to tell anyone. The same thing happened five times in May and June, exactly the same way. Monterrubio told her that if she told anyone he would "put [her] parents in jail." There were no further incidents after June because Doe did not go to the apartment after school once school ended for the summer.

That summer, Doe was feeling "really sad" and "[n]ot really" eating normally. She had not told anyone about what had happened because she was scared. In August, Doe had a sleepover at the home of her friend, Jane Doe 2. Doe told Jane Doe 2 that her godfather was touching her, providing "a little bit" of detail and saying she was scared. She told Jane Doe 2 not to tell anyone.

A couple of days before she testified, Doe learned that her mother had applied for a "U visa." Doe had not heard of a U visa before and testified that she did not really know what it is. No one had ever told her she needed to "say things in a certain way" to help with the visa. On cross-examination, she acknowledged that she knew the visa was "about citizenship" and knew her family did not have legal status. Asked whether she was concerned about her family's illegal status at the time the incidents with Monterrubio were happening, Doe responded, "I wasn't worried, I just knew they were not here legally." She acknowledged having testified at the preliminary hearing that there were some "difficult issues" regarding her family's illegal status at the time of the events. She further acknowledged that when the prosecutor told her family that Monterrubio's "defense was the U visa," Ruth said, "that sounds dumb."

Jane Doe 2 testified that at the sleepover in August 2021 Doe looked sad and did not seem like her usual self. Jane Doe 2 asked if everything was

3

okay and Doe initially said everything was fine. As Jane Doe 2 continued asking, Doe said she "couldn't say anything," then eventually said her godfather was touching her vaginal area. Doe looked "scared, or sad" and they both cried. Doe said she had not told anyone else.[2]

Jane Doe 2's mother testified that the morning after the sleepover Doe 2 told her what Doe had said. Doe 2's mother told Ruth three days later.

Ruth testified that in May and June 2021 she had noticed Doe was becoming "a little bit more shy and more quiet," eating less and having "issues with insomnia." Ruth was worried and asked Doe if anything was going on, but Doe said no. Ruth had seen changes in her two older children in their early teenage years, but Doe's were different; Doe started cutting herself, which her older sister had not done, and "[t]here was a lot of sadness in her eyes."

When Doe 2's mother told Ruth what Doe 2 had reported, Ruth felt "[h]urt, betrayed, sad, angry, shocked." She felt betrayed because she had "trusted [Monterrubio] blindly." Ruth took Doe to the pediatrician. About a month later, on September 27, 2021, she went to Doe's school to ask for counseling and the police were contacted. Ruth met with Detective Rodriguez that day.

In June 2023, Ruth applied for a U visa, which she understood to be a type of visa allowing temporary status for victims of specific types of crimes and their families. She testified that she had first heard of this type of visa at an informational talk at school sometime before 2020 but did not know

---

[2] Jane Doe 2 testified that she and Doe had been friends since elementary school. On cross examination, she said she did not remember when she had last seen Doe prior to the sleepover and she was "not sure" whether they went to the same school.

exactly what the requirements were until sometime in 2022, when she made an appointment to get the information. Asked how she felt when she heard the accusation that her family had made up the allegations against Monterrubio to get a visa, Ruth responded, "I'm mad. I'm angry. I'm just really upset, because to this day my daughter has not been able to open up and tell me what happened. I don't know exactly what happened."

On cross examination, Ruth testified that after speaking with the police officer in September 2021, she was referred to a law firm or legal immigration organization. She got the referral on December 14, 2021, and subsequently got contact information for an immigration attorney in October 2022. The parties stipulated that the form necessary for a U visa application was provided to the district attorney's office on December 28, 2022, certified by that office and returned to Ruth's attorney on January 5, 2023. Ruth filed her application for the U visa in June 2023.

Police Detective Antonio Rodriguez, who was a school resource officer during the initial investigation of this case, took separate statements from Ruth and Doe at Doe's school on September 27, 2021. Doe appeared to have difficulty maintaining eye contact with Rodriguez and was "very soft spoken." Rodriguez testified, "she was "exhibiting mannerisms that are consistent with somebody that's experiencing emotional distress. She was looking down, she was fidgeting with her hands. And when it came time to speak about the incidents that were reported, the thing I remember clearly is she started rocking her leg." Rodriguez explained that he found this significant because he had "vast experience interviewing children that have experienced sexual abuse, and in my training and experience I've witnessed that type of behavior to be indicative of somebody that's attempting to disassociate with explaining the incident, or trauma."

Rodriguez testified that when he entered the assistant principal's office to interview Doe, she was drawing flowers on a notepad. As Rodriguez chatted with her, trying to gain rapport, Doe continued to draw "with purpose," but when they started to discuss her allegations, he noticed that she "would scribble like a couple lines, and immediately erase them, and then write them back again, and immediately erase them, and she did that for almost the entirety of when she was actually speaking about the incidents." This caught Rodriguez's attention "because it was a clear change in behavior" and in his training and experience, "it's indicative that children that are victims of sexual abuse will often exhibit some type of behavior to disassociate themselves from the incident and trauma.

Rodriguez found Doe credible. Because she made disclosures of a sexual nature, a child forensic interview was scheduled. Rodriguez observed the interview and a recording of it was played for the jury.[3] Rodriguez testified that "her mannerisms, and the way that the disclosures were made, and the environment of the child forensic interview room, in my opinion they appeared to be credible." After the interview, Monterrubio was arrested.

**B. Defense Case**

Attorney Josh Sigal testified as an expert on family immigration law and U visas. He explained that a U visa is a type of visa available for victims

---

[3] In the interview, Doe said that all the molestations happened when Norma went to the store and no one else was at home. She thought the boys went with Norma. She said Monterrubio told her not to tell anyone or he would "get [her] mom arrested" and that he would "do it even more" if she told anyone. She felt scared because she thought he was going to do it more and have her mother arrested. She also said that while she and the boys were watching a movie, Monterrubio lay down with them, called her "pretty" and "smacked [her] butt."

of certain crimes, mainly violent crimes, who cooperate with law enforcement to help prosecute the crime. A U visa provides temporary legal status. If U visa status is maintained for three years, the individual can apply for a green card, which provides permanent resident status and may lead to citizenship, but a U visa does not guarantee either green card status or citizenship.

The application process for a U visa requires a certification from a law enforcement agency stating that the individual was a victim of qualifying crime, possesses information helpful to the investigation and is cooperating with the investigation. If the crime victim is under 16 years old, the parents may be eligible for a U visa if they are helpful to the investigation. The average wait time for a decision on a U visa is five years or more.

A.L., Monterrubio's older son, testified that in the spring of 2021, he was in sixth grade and attending school virtually. He logged onto Zoom around 8:40 a.m., did assignments in the middle of the day, and toward the end of the day logged onto Zoom again. His last class ended around 3 p.m. A.L. did his classwork on a bed in his family's bedroom and would be in the bedroom doing his homework when the others returned from school. Monterrubio would get home a little after the others, shower quickly, change and go to his second job, which started at 3:00 p.m.

A.L. testified that his mother always took H.M. with her when she went to pick Doe up from school. H.M. could not be left unattended because of his autism, and he was never left with A.L. or the other children; one of the parents was always with him.[4] Neither of the parents would ever have gone

---

[4] A.L. testified that H.M. had a lot of behavior problems. He was nonverbal and would make "loud, almost like screaming sounds," and he often had tantrums over small things. He also needed assistance with basic things like using the bathroom.

into the bedroom and left H.M. alone in the other part of the house with other children.

A.L. testified that the other children would come into the bedroom while he was doing his homework if they needed to use the bathroom. When Doe came in to use the bathroom, she was always by herself. During the spring semester of 2021, A.L. never missed school; he had checked a record to confirm this. When the school day ended, he would spend about an hour in the bedroom doing his homework and when he finished he would join the others in the living room. He did not do his homework in the kitchen or living room because H.M. would be "loud and distracting."

A.L. acknowledged that he loved Monterrubio and did not want him to get in any trouble, and that Monterrubio was the breadwinner for the family, but testified that he would not be dishonest for Monterrubio.

## II.

### *Procedural Background*

Monterrubio was charged by information filed on April 18, 2023, with one count of lewd act upon a child under the age of 14 years (Pen. Code,[5] § 288, subd. (a)) and one count of sexual penetration with a foreign object (§ 289, subd. (a)(1)(B)). The information alleged four aggravating circumstances. (Cal. Rules of Court,[6] rules 4.421(a)(1) [crimes involved great violence]; 4.421(a)(3) [vulnerable victim]; 4.421(a)(11) [took advantage of a position of trust]; 4.421(b)(1) [violent conduct indicating danger to society].)

On September 5, 2024, a jury found Monterrubio guilty of both offenses and found the aggravating circumstances true. On November 7, 2024, the

---

[5]  Further statutory references will be to the Penal Code.

[6]  Further references to rules will be to the California Rules of Court.

8

court sentenced him to the upper term on each count for a total sentence of 20 years in prison.

This timely appeal followed.

## DISCUSSION

Monterrubio contends the trial court abused its discretion in allowing Detective Rodriguez to testify that Doe was credible and that she behaved like a victim of child sexual abuse. The prosecutor did not present Rodriguez as an expert witness and he was not qualified as such. Rodriguez referred to his training and experience in stating his opinions and observations, however, and on cross examination defense counsel questioned him about his background, training and experience in law enforcement and specifically in investigation of child abuse cases.[7] Monterrubio argues Rodriguez's opinion on Doe's credibility was inadmissible whether Rodriguez was testifying as a layperson or as an expert witness; his argument regarding the testimony that Doe behaved like a sexual abuse victim treats Rodriguez as an expert witness.

---

[7] Rodriguez had been a detective for about a year and a half at the time of trial; during the initial investigation of this case, he was a police officer working as a school resource officer. Prior to this investigation, he had attended approximately 500 hours of instruction at the police academy, a "large block" of which was "centered on child abuse and sexual assault, sex crimes against children." As a patrol officer, he was involved in numerous investigations of child sexual abuse allegations, and as a school resource officer he "routinely" took initial reports of children's disclosures to school counselors or family members which he would then refer to detectives. Because Rodriguez aspired to be a detective, he worked with the sex crime detective and shadowed her child forensic interviews. He had observed 5 to 10 child forensic interviews at the time of the present investigation and by the time of trial he had observed about 10 and conducted 21.

# I.

## *Opinion on Credibility*

### A. Additional Background

On direct examination, when the prosecutor asked if Rodriguez found Doe credible in the initial interview at school, the officer replied, "Absolutely." Defense counsel objected, "relevance, calls for speculation, outside the scope of the witness, foundation," and the court sustained the objection. Rodriguez then explained the protocol for scheduling and conducting a forensic interview when an officer receives a report of child sexual abuse, and authenticated the recording of Doe's forensic interview, which was played for the jury.

Much of Rodriguez's cross examination focused on his training and experience with investigations of child sex crimes, including techniques used in interviewing children, both in general and in this case in particular. On redirect, the prosecutor described Rodriguez having been asked a number of questions about "juvenile witnesses, children, wanting to please police officers in forensic interviews" and asked, "Was there anything about Jane Doe's interview that gave you pause or concern as far as her disclosures?" Rodriguez responded, "Absolutely not." Asked, "[w]hy is that?" Rodriguez testified, "Well, at the time, based on the training and experience I had at the time, based on her mannerisms, and the way that the disclosures were made, and the environment of the child forensic interview room, in my opinion they appeared to be credible." Defense counsel objected, "non-responsive," and the objection was overruled.

### B. Governing Law

"A lay witness may testify in the form of an opinion only when he cannot adequately describe his observations without using opinion wording.

10

(Jefferson, Cal. Evidence Benchbook (1972) § 29.1, pp. 495-496.) 'Whenever feasible "concluding" should be left to the jury; however, when the details observed, even though recalled, are "too complex or too subtle" for concrete description by the witness, he may state his general impression. [Citation.]' (*People v. Hurlic* (1971) 14 Cal.App.3d 122, 127.)" (*People v. Sergill* (1982) 138 Cal.App.3d 34, 40 (*Sergill*).)

" 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' (Evid. Code, § 720, subd. (a).) An expert witness may give opinion testimony '[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion.' (Evid. Code, § 801, subd. (b).)" (*People v. Brown* (2014) 59 Cal.4th 86, 99-100.) " 'The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful.' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 46, quoting *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)

11

## C. Analysis

### 1. *The Claim Was Forfeited.*

Monterrubio objected to the testimony he now challenges as improper opinion testimony not on this ground but only as nonresponsive. A defendant's "failure to make a timely and specific objection on the ground he now raises forfeits the claim on appeal." (*People v. Pearson* (2013) 56 Cal.4th 393, 416; *People v. Coffman and Marlow, supra,* 34 Cal.4th at pp. 81-82 [forfeiture of improper opinion challenge by failure to object, or to object on this ground]; *People v. Rodriguez* (2014) 58 Cal.4th 587, 631 [improper opinion argument not cognizable due to failure to object on this ground].) The specific objection requirement "is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' [Citation.] 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*People v. Partida* (2005) 37 Cal.4th 428, 434.) "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Id.* at p. 435.)

Monterrubio asks us to exercise our discretion to consider his claim despite his failure to object to Rodriguez's testimony as improper opinion evidence. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) That we are not *precluded* from reaching the issue, of course, does not require us to do so, and Monterrubio suggests no particular reason for us to depart from the

usual forfeiture rules. (See *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 649 [exercising discretion to review improper jury instruction where objection would have been futile, prosecution was "at least equally at fault in allowing the error," and "shocking nature of the error . . . rendered the trial unfair"].)

### 2. *Any Error Was Harmless.*

In any event, we are convinced that even if Rodriguez's testimony was improper, Monterrubio was not prejudiced by it. The testimony at issue came in the course of Rodriguez's explanation why he did not find anything problematic in the way Doe's forensic interview was conducted. On cross examination, defense counsel had questioned Rodriguez about ways to determine a child's understanding of truth and lies; children's susceptibility to suggestion, particularly in the context of a police interview; and whether specific questions asked during Doe's interview were suggestive. In response to this line of questioning, the prosecutor asked Rodriguez whether anything about the interview "gave you pause or concern as far as her disclosures." Rodriguez's response—that Doe's disclosures appeared to be credible based on her mannerisms, the "way that the disclosures were made" and the "environment of the child forensic interview room"—was not so much a general statement that Rodriguez believed Doe was telling the truth as an explanation that he did not see anything in the way the interview was conducted that would have led Doe to say what she believed the interviewer wanted to hear rather than what Doe claimed happened.

The jurors were instructed that they were the sole judges of the credibility of witnesses and could believe all, part or none of a witness's testimony. They were instructed that they were not required to accept an expert witness's opinion as true or correct and could disregard any opinion they found unbelievable, unreasonable or unsupported by the evidence, and

13

that the same applied to witnesses not testifying as experts. The prosecutor's closing argument emphasized that the jurors were "the sole judges of the credibility of the witnesses," stating, "You and only you decide who's telling the truth. You and only you decide who has a motive to lie. [¶] Did you believe [Doe]? That's what this case is going to come down to. Did you believe Jane Doe? Did you find her credible? Did you find that she was telling the truth? If you believe Jane Doe then the defendant is guilty. If you don't believe her, then he's innocent, and you find him not guilty." After noting that the jurors had heard the forensic interview and testimony of "the officers," Doe's mother and Doe's friend, the prosecutor urged, "But most important of all, you heard from Jane Doe."

These circumstances are quite different from those in *Sergill, supra,* 138 Cal.App.3d 34, which involved sexual abuse of a child by her uncle. A police officer who interviewed the child testified that "he could usually determine 'with a high degree of accuracy' whether a child's statements were true, and that he believed the girl was telling the truth to him," and another officer testified that "she questioned the girl to try and arrive at the truth" and "thought she had determined the truth." (*Id.* at p. 41.) *Sergill* held there was no basis for admission of this testimony.

In finding the error prejudicial, the *Sergill* court noted a number of reasons to question the evidence against the defendant: The case had been tried previously and the jury had been unable to reach a verdict; there were inconsistencies between the child's several accounts of the incident as well as between her account and her mother's; there was evidence of animosity among members of the family; and while there was medical testimony that the girl's physical condition was consistent with sexual abuse, this diagnosis was premised on the girl's report and the physician acknowledged that he

14

would have been "puzzled" about the cause of what he observed if he had not heard her report. (*Sergill, supra,* 138 Cal.App.3d at p. 41.)

Most significant to the *Sergill* court's analysis of prejudice, however, was that "[i]n the presence of the jury, the court declared in effect that [the first officer] was especially qualified to render his opinion as to whether a person reporting a crime was telling the truth." (*Sergill, supra,* 138 Cal.App.3d at p. 41.) Specifically, in overruling defense counsel's objection when the officer was asked his opinion on whether the victim was telling the truth, the trial court stated that the officer was qualified to offer his opinion because his seven years of experience, including writing a thousand or more reports, indicated he had experience taking witnesses' testimony and evaluating whether a person was telling the truth. (*Id.* at p. 38.) *Sergill* held that "[t]he court's comment may well have caused the jury to place undue emphasis on the officers' testimony. It is reasonably probable that the combined effect of the court's comment and the improperly admitted opinion testimony was the usurpation of the jury's function as fact finder." (*Id.* at p. 41.)

Here, neither the trial court nor the prosecutor highlighted Rodriguez's testimony that he found Doe's allegations in the forensic interview credible. To the contrary, the prosecutor emphasized that the jurors were the sole judges of Doe's credibility and urged them to evaluate her credibility on the basis of the recording of the interview they had seen and Doe's testimony at trial. The reasons to question Doe's testimony that Monterrubio points to— including his theory that the family fabricated Doe's story in order to pursue a U visa and A.L.'s testimony that he was always in the bedroom and Doe could not have been alone with his father—were fully presented to the jury by the defense and countered by the prosecution. Considering the evidence, the

15

arguments and the absence of any particular emphasis on Rodriguez's view of Doe's credibility, we see no reasonable probability the jury would have reached a different conclusion in the absence of the challenged testimony.

## II.

### *Testimony That Doe Acted Like Victim of Sexual Abuse*

### A. Additional Background

After Rodriguez testified that he interviewed Doe in the assistant principal's office at her school, the prosecutor asked what Doe was doing when Rodriguez walked into the room. Rodriguez testified that Doe was sitting inside the office with a notepad, crayons and pencils and "[i]t looked like she was coloring." She continued to draw as he started his questions.

The prosecutor asked, "Did she do anything that caught your attention?" Defense counsel objected on hearsay grounds and the court overruled the objection. Rodriguez testified, "Yes, she did." Asked for further explanation, Rodriguez responded, "when I initially walked into the room, I tried my best to get down and gain some rapport with her, we were chatting about, you know, stuff that a 6th grade kid likes to do. Chatting with her. And when I was talking with her about that stuff she was drawing with purpose, she was drawing flowers and whatnot. And as soon as we started getting to the allegations of the incidents that she started disclosing to me, I really paid attention to the fact that she was—I remember she had, it was a mechanical pencil, and she would scribble like a couple lines, and immediately erase them, and then write them back again, and immediately erase them, and she did that for almost the entirety of when she was actually speaking about the incidents." The prosecutor asked Rodriguez why this caught his attention and Rodriguez explained that "it was a clear change in behavior. It was, in my experience, training and experience, it's indicative

16

that children that are victims of sexual abuse will often exhibit some type of behavior to disassociate themselves from the incident and trauma."

**B. Analysis**

### 1. *The Claim Was Forfeited.*

Monterrubio argues Rodriguez's testimony that Doe was acting like a victim of sexual abuse was improper in that it stated a legal conclusion that she had in fact been sexually abused and constituted improper vouching for her veracity. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 180 [expert testimony that children rarely make false allegations of sexual abuse is improper vouching]; *People v. Munch* (2020) 52 Cal.App.5th 464, 468 [expert may not give opinion on whether victim is telling truth]; *People v. Julian* (2019) 34 Cal.App.5th 878, 887 [expert testimony on statistical rarity of false accusations by child sexual abuse victims improperly boosts credibility of victim].) Acknowledging that defense counsel did not object to the testimony on these grounds, Monterrubio argues the issue is cognizable on appeal because counsel objected twice on hearsay grounds and a defendant is not required to repeatedly object to a line of questioning after objections have been overruled. The cases Monterrubio relies on establish that a defendant is not required to repeatedly renew a previously overruled objection on the same grounds in order to raise the same issue on appeal. (*People v. Antick* (1975) 15 Cal.3d 79, 95; *People v. Meacham* (1984) 152 Cal.App.3d 142, 155; *People v. Zemavasky* (1942) 20 Cal.2d 56, 62.) Monterrubio offers no authority suggesting the forfeiture doctrine does not apply where the overruled objection was on a *different* ground than the issue raised on appeal. Monterrubio's hearsay objection did not preserve his claim that the testimony constituted improper vouching or opinion testimony.

## 2. *Monterrubio Has Not Demonstrated Ineffective Assistance of Counsel.*

Monterrubio contends that if his attorney's objections were insufficient, the failure to object on grounds of improper vouching or legal conclusion constituted ineffective assistance of counsel. To prevail on this claim, Monterrubio must establish, first, that counsel's failure to make the proper objection "fell below an objective standard of reasonableness under prevailing professional norms" and second, "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

We are not convinced that counsel's conduct was deficient. Rodriguez did not directly testify that Doe "act[ed] like a victim of sexual abuse" or that he concluded she had in fact been sexually abused. Rather, he testified that he observed behavior by Doe that, in his training and experience, was "indicative" of someone trying to "disassociate" with the incident or trauma of sexual abuse. The testimony Monterrubio challenges is Rodriguez's statement that while interviewing Doe, when his questions moved from general rapport-building efforts to specific discussion of Doe's allegations, his attention was caught by her changing from the purposeful drawing she had been engaged in to repeatedly scribbling and immediately erasing what she had written. The reasonable inference to be drawn from this testimony is that Rodriguez was struck by Doe's change in behavior because he recognized it as consistent with what a victim of child sexual abuse might do, not that he was saying the behavior caused him to conclude Doe had in fact been sexually abused. So understood, the testimony offered the jurors information they would not necessarily have had about the behavior of a child reporting sexual abuse, and it would have been reasonable for counsel to see no basis for the objections Monterrubio contends should have been made. Indeed,

18

Monterrubio does not challenge a similar portion of Rodriguez's testimony in which the officer stated that when first talking with Doe at school, his attention was caught by her starting to "rock[] her leg," which he said was also a type of behavior he had witnessed as "indicative of somebody that's attempting to disassociate with explaining the incident, or trauma."[8]

To the extent Rodriguez's testimony can be seen as improperly stating a legal conclusion or vouching for Doe's credibility, and counsel can be faulted for failing to object on these grounds, we conclude Monterrubio was not prejudiced. Rodriguez's testimony made clear that his interviews at Doe's school were a preliminary step that served as the basis for proceeding with the forensic interview at which the truth of the allegations would be assessed. The jurors likely understood that Rodriguez's belief Doe was acting in a manner consistent with having been abused was a trigger for further investigation rather than a determination that she had in fact been abused. The prosecutor referred to this testimony in closing argument as "interesting observations" of behavior that, according to Rodriguez's training and experience, was consistent with that of child sexual abuse victims; the prosecutor did not suggest Rodriguez took this behavior as proof Doe had been sexually abused and did not dwell on the testimony. As we have said, the jury was instructed, and the prosecutor reiterated, that the jurors were the sole judges of witnesses' credibility. The jurors were able to observe and evaluate Doe's demeanor as she related her allegations in the forensic interview and at trial. They were able to evaluate the credibility of witnesses who corroborated her story—her mother and her friend—as well as that of

---

[8] Defense counsel unsuccessfully objected on grounds of foundation to the question that elicited this response, which asked why Rodriguez found the leg-rocking significant.

19

A.L., whose testimony, if true, would have proved the events Doe described were impossible. We see no reasonable probability that a juror who was otherwise unconvinced Doe was telling the truth would have been swayed to the contrary because the juror took Rodriguez's testimony to indicate the officer concluded Monterrubio was guilty based on Doe's behavior when the officer first interviewed her.[9]

## DISPOSITION

The judgment is affirmed.

---

[9] Having concluded the errors Monterrubio complains of were forfeited or harmless, we also conclude Monterrubio's claim of cumulative prejudicial error is meritless. (*People v. Linton* (2013) 56 Cal.4th 1146, 1197.)

20

                              STEWART, P. J.


We concur.


MILLER, J.


DESAUTELS, J.


*People v. Monterrubio* (A172249)